**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| M.G., *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>INVIA FERTILITY SPECIALISTS, PLLC,<br><br>Defendant. | Civil Action No.:<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff M.G. at all times relevant herein, was a patient of InVia Fertility Specialists, PLLC ("InVia" or "Defendant"), and brings this class action against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. InVia is a reproductive health provider specializing in IVF, IUI, egg freezing, sperm freezing, and other fertility treatments. As part of its medical services, Defendant offers its patients online medical services and obtains and handles highly sensitive personal health information related to reproductive healthcare through its online medical services.

2. Plaintiff and Class Members are Defendant's current and former fertility patients who utilized Defendants' online medical services to book appointments, complete medical forms, and access the patient portal.

**CLASS ACTION COMPLAINT**

3.      Plaintiff brings this class action lawsuit to address Defendant's unlawful practice of implementing tracking technology on its website and disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII"), protected health information ("PHI"), and confidential health communications ("CHC") (collectively referred to as "Private Information") to unauthorized third parties, including Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta" or ("Facebook"), and Google LLC ("Google") (Meta and Google will be collectively referred to as the "Unauthorized Third-Party Marketers"). Defendant improperly disclosed and misused the Private Information for the purpose and intent of enhancing Defendant's marketing capabilities and monetizing Plaintiff's and Class Members' Private Information.

4.      Defendant is a HIPAA covered healthcare entity and thus its disclosure and use of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can (a) use a person's personally identifiable protected health information for marketing purposes or (b) disclose the personally identifiable protected health information to a third party without express written authorization.

5.      Defendant owns and controls www.inviafertility.com ("Defendant's Website" or the "Website") and encourages its patients to use the Website for scheduling appointments, researching treatment options, financing medical treatments, and accessing patient forms and consent documents, as well as other medical services. Included within the Website is Defendant's patient portal allowing access to medical records, viewing appointment details, and obtaining lab

**CLASS ACTION COMPLAINT**

results ("the Patient Portal"). Defendant also offers its patients a patient portal app that can be downloaded ("the APP").

6.      While Plaintiff is still identifying the full extent of the tracking tools used, a pre-suit investigation of HAR files and network traffic confirmed that Meta and Google pixels are deployed across the Website's sensitive areas, including the homepage, scheduling and confirmation pages, patient forms, and treatment sections. Additionally, pre-suit investigation confirms that similar tracking was operating on the authentication page of the Patient Portal login page. Discovery will be necessary to determine.  Without discovery it is unknown how the tracking technology operated on the Patient APP or after a user logged in on the on the Patient Portal.

7.      The specific tracking tools include three Google Tag Manager containers, two Google Analytics 4 properties, two Universal Analytics properties, the Facebook Meta Pixel, and Google Ads Remarketing ("Tracking Tools").

8.      The Tracking Tools specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered as "free" to companies like Defendant but require the website owner to share and disclose the web users' valuable behavioral web browsing data with the Unauthorized Third-Party Marketer.

9.      To be sure, "data is the new oil of the digital economy,"[1] and Meta has built its more-than $300 billion market capitalization on mining and using that "digital" oil. Google, and

---

[1]   Joris Toonders, *Data is the New Oil of the Digital Economy*, WIRED (July 16, 2014), https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/, available at https://www.linkedin.com/pulse/20140716110251-7386607-data-is-the-new-oil-of-the-digital-economy/.

**CLASS ACTION COMPLAINT**

other ad tech companies are similarly motivated, with Google's online advertising business generated 42.4% of global digital ad revenues in 2023.[2]

10. With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

11. Indeed, the Unauthorized Third Parties each offer Tracking Tools free of charge,[3] but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

12. By deploying a combination of Facebook and Google tracking on its fertility provider Website, Defendant maximized the exposure of its patients' and prospective patients' reproductive health data to advertising ecosystems to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

13. In implementing the Tracking Tools, however, Defendant deprived Plaintiff and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiff's and Class Members' confidential communications and Private Information; (2) causing Plaintiff's and Class Member's communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes; and (4) converting and monetizing the Private Information through various marketing tactics, which upon and belief, included, audience building, retargeting, geo-location, and other invasive

---

[2] *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/.
[3] *Facebook Pixel: What It Is and Why You Need It*, SEO DIGITAL GROUP, https://seodigitalgroup.com/facebook-pixel/ (last visited Apr. 21, 2026).

**CLASS ACTION COMPLAINT**

marketing tactics. At no point along the data monetization process did Defendant obtain proper express written consent from Plaintiff or Class Members for any of these tortious acts.

14. Plaintiff's and Class Members' browsing and behavioral data qualifies as PHI because: (1) the data related to (a) a past, present and future medical condition of the patient and/or (b) the provision of health care; and (2) the data was sent in combination with direct and indirect identifiers from which the Plaintiff and Class Members could be reasonably associated with the data.

15. First, the Private Information consisted of Plaintiff's and Class Members' page views of sensitive URL and page titles and button clicks that related to: (1) specific fertility treatments and procedures; (2) desired medical appointments; (3) confirmed appointment submissions; (4) new patient contact requests; (5) completion of medical forms; and (6) portal login activity. At a minimum, the disclosed Private Information allowed the Unauthorized Third-Party Marketers to learn that Plaintiff and Class Members were patients considering, seeking, or receiving treatment at InVia clinics. In and of itself, the disclosure of the behavioral data revealed that Plaintiff and Class Members were fertility medical patients and InVia was providing fertility health care to them.

16. Second, it is well recognized in the computer science and marketing communities that the type of Private Information collected and disclosed by Defendant's Tracking Tools was not anonymous. Meta and Google can use various cross referencing and algorithmic methods to identify the Plaintiff and Class Members from the uniform and baseline set of disclosed Private Information, including some or all of the following: (1) first-and-third-party user account cookies; (2) first-party device identifiers; (3) IP addresses; (4) user agents; and (5) other device properties.

**CLASS ACTION COMPLAINT**

17. To be sure, Google and Meta each have the ability use these data points to identify an individual user regardless of (a) whether the user is logged into a Google or Meta; (b) whether the user navigated with a specific browser; or (c) whether cookie blockers were enabled. Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information.

18. This Tracking Technology is not necessary to operate Defendant's Website or to provide standardized health care. Defendant has other reasonable alternative analytics and marketing that are HIPAA compliant that would have prevented Defendant's tortious acts, but Defendant opted for known non-HIPAA-compliant analytics and marketing tactics to take advantage of the free services and gain access to Meta's and Google's powerful analytics, audience building, and re-targeting tools.

19. At no point did InVia have a HIPAA-compliant Business Associate Agreement ("BAA") in place with any of the Unauthorized Third Parties to safeguard its patients Private Information, and these companies are publicly vocal that they will not enter into healthcare BAA agreements.

20. Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools.[4] The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA**

---

[4] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

**Rules.**" In other words, HHS has expressly stated that InVia's implementation of Tracking Tools violates HIPAA Rules.

21.     In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiff's and Class Members' highly sensitive communications and Private Information to Unauthorized Third Parties, including communications that contained private and confidential health information; and further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiff's and Class Members' highly sensitive communications and Private Information. Neither Plaintiff nor any Class Member signed a written authorization permitting InVia to disclose or use their Private Information for marketing purposes.

22.     Defendant breached its common law, statutory, and contractual duties by: (1) failing to adequately train its marketing and digital departments on the privacy risks of using Tracking Tools; (2) failing to adequately review and test its marketing programs and web-based technology to ensure the Website was safe and secure for its patient to submit confidential Private Information; (3) intentionally implementing tracking technology that was known and specifically designed to collect and share users' browsing information with third-party marketing companies; (4) failing to timely remove or disengage the Tracking Tools when on notice about the unlawful disclosure and misuse of the Private Information; (5) failing to take steps to select HIPAA-compliant marketing vendors and analytics tools; (6) failing to take steps to anonymize Plaintiff's and Class Members' web data before transmitting and sharing it with Third-Party Marketers; (7) failing to obtain proper consent for the disclosure of the Private Information; (8) failing to obtain proper consent for the use of the Private Information for marketing purposes; (9) failing to adequately warn Plaintiff and Class Members of the disclosure and use of the data for marketing purposes; (10) unjustly profiting from Plaintiff's and Class Members' Private Information; (11)

otherwise failing to comply with HIPAA guidelines and statutory requirements; (12) otherwise failing to comply with FTC guidelines, warnings, and requirements; and (13) otherwise failing to design, monitor, and maintain its Website in a secure and confidential manner to protect Plaintiff's and Class Members Private Information from improper disclosure and use.

23. As a direct and proximate result of InVia's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of contract, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

24. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and, in the alternative, nominal damages. Plaintiff further seeks restitution and disgorgement of (a) profits or cost savings obtained and (b) the value of the data unjustly collected and misused in their marketing programs. Finally, Plaintiff seeks injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

25. Plaintiff brings causes of action for (1) Violation of Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1) *et seq.*; (2) breach of implied contract; (3) unjust enrichment; (4) violation of Illinois Consumer Fraud and Deceptive Business Practices Act

**CLASS ACTION COMPLAINT**

("ICFA"), 815 ILCS 505/1. *et seq.*; (5) Violation of the Illinois Eavesdropping/Interception Common and Statutory Law, 720 ILCS 5/14-2(a), *et seq.*; and (6) negligence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, *et seq.*).

27.     This Court has general personal jurisdiction over Defendant because Defendant is headquartered and operates its business in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

28.     Venue is proper under 28 U.S.C § 1391(b)(1)-(2) because Defendant conducts business in this District and a substantial part of events or omissions giving rise to Plaintiff's claims including Plaintiff's use of Defendant's website occurred in this District.

## THE PARTIES

29.     Plaintiff M.G. is an adult citizen and resident of the State of Illinois and is domiciled in Cook County where she intends to remain.

30.     InVia is an Illinois professional limited liability company with its headquarters in Illinois at 1585 North Barrington Road, Doctors Building Two, Suite 406, Hoffman Estates, IL 60169 and principal place of business in Connecticut, at 400 Capital Boulevard, Suite 102, Rocky Hill, CT 06067. Defendant has six fertility clinics; all located in Illinois. Service is proper upon its registered agent CT Corporation System, 208 South LaSalle St., Suite 814, Chicago, IL 60604-1101.

31.     Defendant is also part of a fertility network known as First Fertility, a national partnership of Fertility Clinics based in Rocky Hill, Connecticut.

**CLASS ACTION COMPLAINT**

## COMMON FACTUAL ALLEGATIONS

### A. Underlying Web Technology & Communications

32. To understand Defendant's unlawful data-sharing and illicit marketing practices, it is important first to understand basic web design and tracking tools.

33. Devices (such as computers, tablets, or smart phones) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

34. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

35. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[5]

---

[5] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

**CLASS ACTION COMPLAINT**

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Cookies are also "first-party" cookies usually implemented to gather analytics for site owners. First-party cookies are used for both same site and cross-site tracking.

- **Ghostwriting Cookies:** While the "third-party cookies" may be blocked, "first-party cookies" are essential for web functionality and cannot be typically blocked for the user to properly engage and use the site with logging in or submitting webforms. Since some web browsers have not started to restrict "third-party cookies," tracking technologies also ghost-write first-party cookies on the website domain to circumvent third-party cookie blocking. Google and Meta are the most pervasive cookie ghostwriters.

36. Every website is comprised of "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

37. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of transmissions to Google's own web servers.

**CLASS ACTION COMPLAINT**

38. In this case, Defendant deployed Tracking Tools through its Source Code, including the Meta Pixel and Google Analytics tool, to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Meta and Google.

39. Defendant's Source Code manipulated the Plaintiff's and Class Members' browsers by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Meta and Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

40. Thus, without its patients' or donors' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Meta and Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

41. As explained below, these unlawful transmissions and data misuses are initiated by Defendant's source code concurrent with communications made via certain webpages.

42. As an example, when a patient or donor visits www.inviafertility.com and navigates to the "Make an Appointment" page, their web browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads that particular webpage forming the webpages content and features.

**B. Tracking Tools**

43. The Unauthorized Third-Party Marketers offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the surveillance, interception, and collection of user communications and activity on those platforms. The Tracking Tools are used to collect, aggregate, profile, build, identify, target, and market products and services to specific individuals.

**CLASS ACTION COMPLAINT**

44.     Tracking Tools are a type of behavioral advertising that track consumers online activity–such as search terms, web pages visited, content viewed, forms submitted–for the purpose of delivering advertising targeted to the individual consumer's interest.

45.     In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc., revealing the behavioral browsing data. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website, and configuring advanced matching tools that gather more sensitive and identifiable data from such sensitive parts of the Website as form submissions. Defendant and the Third-Party Marketers, and potentially some marketing vendors, are in exclusive control over what additional configurations were set to capture and share data over and beyond the standard settings– e.g., Meta advanced matching, which commonly implemented to improve targeted audience marketing.

46.     When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party, and that user's browsing information is then automatically incorporated and used in the marketing tactics.

47.     The Tracking Tools individually and collectively track and disclose to the Unauthorized Third-Party Marketers what a user communicates to Defendant on its website.[6]

---

[6]   Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website.

**CLASS ACTION COMPLAINT**

48.     Notably, unauthorized transmissions only occur on webpages that contain Tracking Tools.[7] Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to the Unauthorized Third Parties but for Defendant's decisions to install the Tracking Tools on its Website.

49.     The Tracking Tools further capture and disclose full sensitive URL structures which are transmitted to all tracking platforms directly revealing Private Information related to the individuals past, present or future fertility care. Some examples of sensitive URL structures at issue here include:

| URL www.inviafertility.com/ | Inference/PHI |
| --- | --- |
| /schedule-appointment | Making Appointment/Patient status |
| /appointment-request-thank-you | Confirmed Appointment/Patient Status |
| /patient-forms-consent | Completed medical forms/ Patient Status |
| /treatment-options-egg-freezing | Specific medical care/Patient Status |

50.     The Tracking Tools allow the Unauthorized Third-Party Marketers to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it to deliver targeted advertisements to specific individuals. The Unauthorized Third-Party Marketers then use the web user activity and monetize it through building audience profiles and campaigns from the user's specific activity on the Website to then offer to other marketers.

---

[7] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20 stores%20a%20client,is%20disabled%20through%20Consent%20Mode (last visited Apr. 22, 2026).

**CLASS ACTION COMPLAINT**

51.     The Tracking Tools further allow the advertiser, such as Defendant, to directly optimize and monetize the collection and aggregation of the patient web data by creating custom and look-a-like audiences to deliver more efficient advertisements, decrease advertising and marketing costs, and more effectively measure conversions to design future campaigns. The digital marketing activity here was likely deployed through the use of Meta Business Suite tools, and similar concepts on the other platforms to allow for retargeting of web users and building and targeting look-a-like audiences from that web user data. At no time, did Defendant obtain express, or even implied, consent to utilize and monetize its users' and its patients' Private Information for marketing purposes.

**C. Specific Types of Tracking and Their Marketing Purposes**

    **i.**        **Meta Pixel & Custom Audiences**

52.     The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager. The Meta Pixel provides real time analytics data to Meta's algorithms, allowing for automatic optimization of ad delivery.

53.     The Meta Pixel uses the c_user third-party cookie to link users with an individual Facebook account and facilitate cross site tracking. If the website visitor is also a Facebook user, Meta will associate the collected information with a Facebook C_user cookie ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status,

**CLASS ACTION COMPLAINT**

and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

54. By default, Meta also uses first-party cookies to help advertisers maintain tracking while third-party cookies are phased out due to privacy concerns. The first-party cookies include unique identifiers _fbp or fbc cookies which allow the website to communicate with Meta about the users' actions and identify the user even if the user has blocked third-party cookies.

55. In addition to website analytics, the Meta Pixel creates value for advertisers like Defendant by providing a website with access to sophisticated algorithms and computer learning (AI) tools that allowed the website owner to further utilize the behavioral data that was collected from the Website to build highly targeted audiences. These audiences include both custom audiences and look-a-like audiences.

56. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and did not request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget that user by linking the user with the unique identifier to then target him/her with specific ads to try to get him/her to come back to the Website to schedule an appointment.

57. A "look-a-like audience" is designed with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for IVF treatment, it could analyze, segment and use the data collected from patients who completed book an appointment forms for IVF treatment to build a look-a-like audience. That

**CLASS ACTION COMPLAINT**

audience would then be used in combination with Meta's vast ecosystem, use of the unique identifiers, and advertising platform to get ads in front of individuals with the same or similar profiles as the current IVF patients of Defendant.

58. In other words, the powerful Meta algorithm that has been gathering data from the first-and-third-party cookies and the users' browsing activity across all aspects of the internet can then incorporate the patient browsing data from the Website to build audiences from that data. Once the audiences are built, Defendant can then place digital advertisements in front of those audiences with the greatest chance of converting on the targeted advertisement. The acquisition or conversion cost is then projected to be far lower than if an advertiser attempted to use less sophisticated forms of advertising like traditional media, where the add impression cost is much higher and the cost to convert a new customer is higher.

## ii. Google -Universal Analytics

59. Universal Analytics ("UA") was Google's major web analytics program (introduced in 2012) and built to help businesses measure, understand, and optimize web users' behavior across websites and apps. UA collected and aggregated data relates to what actions the user took on the site such as page views, events, and transactions. UA relied on the first-party cookie to identify the unique users.

60. For many marketers, UA became the primary tool for creating tailored marketing campaigns with custom metrics, segmentation, and conversion goals that could be measured.

61. Google uniformly stored a unique identifier in its logs for each Plaintiff and Class Member, whether in private browsing mode or non-private browsing mode. The unique identifier

**CLASS ACTION COMPLAINT**

can then be used to connect the individual with the collected browsing activities on that Website. Google then uses the identifiable behavioral data for serving personalized ads.[8]

62. If Plaintiff or a Class Member was logged into their Google accounts while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[9]

63. In short, UA existed to allow businesses to understand how users interacted and behaved on their websites, apps, and advertisements and provided highly effective and valuable data reporting tools to help improve strategy and marketing ROI.

64. Google Analytics 4 replaced UA on July 1, 2023, but some enterprise customers received extensions for one additional year.

65. Upon information and belief, Google replaced UA with GA4, in part, due to compliance issues with evolving privacy laws in the European Union (GDPR) and some states like California (CCPA).

**iii. Google Analytics 4**

66. GA4 is event driven which means that it captured every user interaction (clicks, scrolls, video plays, form submissions) and is more accurate than UA.

67. GA4 also incorporates more predictive analytics and machine learning based insights to provide conversion probability and revenue predictions.

---

[8] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Dec. 20, 2023) ("Such PHI may include, for example, an individual's IP address . . .").
[9] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, Fn. 11 (Google employee deposition testimony explaining how Google tracks user data).

**CLASS ACTION COMPLAINT**

68. Even though GA4 was designed to offer more privacy protections, a number of privacy issues remain when utilizing the analytics on a healthcare website.

69. GA4 still processes data that is considered personally identifiable information under HIPAA, including IP addresses, user IDs, cookies, and device identifiers.

70. While there are additional settings such as IP anonymization, consent management, and data minimization, Defendant is in exclusive control of those settings that will allow for a complete analysis of the configurations.

71. GA4 still operates utilizing cookies and tracking tech that requires patient consent before collecting, disclosing, and using the data for marketing purposes.

### iv. Google Ad Words

72. Google through Ad Words is the dominant provider of sponsored search advertising. Google sells advertising through its search engine and ad intermediation product Ad Sense. Google is also an advertising intermediary that utilizes contextual ads to target users online based on what they are currently viewing.

73. Google Ads allows business to create and manage ad campaigns across Google Search, You Tube, and partner sites. Advertisers choose keywords, set budgets, and bid for ad placements. It operates on a pay-per-click model where the advertisers pay only when someone clicks on the ad. This marketing is targeted marketing built from audience data and used to drive traffic to websites and ads, create leads, and convert new clients.

74. Google Ad Sense offers placement targeting of ads on specific publisher websites to advertisers. The goal is to present an ad that is related to the current article of interest. For example, if the user is reading an article on a specific medical procedure, they may see an ad for a related medical clinic. The ads are placed based on relevance and likelihood the user will connect

**CLASS ACTION COMPLAINT**

with the ad and convert on the intended sale offer. The cost is usually measured in a cost per click value.

75.     Branded marketing on display ads on the other hand, is placed to create awareness and are priced based on impressions rather than direct interaction with the ad.

### v. Google Ads Remarketing & DoubleClick

76.     DoubleClick is an advertising platform that provides advertisers with tools to create, manage and grow digital marketing campaigns. The tools include precise audience retargeting, real time ad bidding, cross platform tracking, and marketing analytics to allow marketers to optimize campaigns, make more efficient and effective marketing decisions, and increase the return on investment (ROI).

77.     DoubleClick does not provide contextual advertising. Rather its purpose is to collect technical data that helps identify and distinguish browsers and devices including browser type and version, operating system, device type, screen resolution, language settings, and approximate IP address. This data can be used by Google to identify a specific user through browser fingerprinting.

78.     DoubleClick tracks how users interact with ads and websites that use Google ad services including tracking (1) ads viewed or clicked, (2) websites visited, (3) time spent on pages, and (4) conversions (i.e., signups, form submissions). This data is used for ad measurement (e.g., ad delivery, conversion tracking, campaign performance) and retargeting.

79.     Based on browsing behavior, DoubleClick helps build interest-based advertising profiles based on inferred interests, ad engagement patterns, and demographic estimates.

80.     If a user is signed into a Google Account, DoubleClick would be linked to the Google account allowing for cross-device tracking.

**CLASS ACTION COMPLAINT**

**D. Defendant's Tracking Tools Collected and Disclosed PHI to Third-Party Marketers for Marketing Purposes without Patient Consent.**

81. Defendant implemented and configured Tracking Tools with the intent to surveil and follow its patients and potential patients across its Website to enhance its marketing profitability.

82. Defendant utilized the most powerful Tracking Tools available and implemented them sitewide, including the Meta Pixel, Universal Analytics, Google Analytics 4, and Google Ads Remarketing and DoubleClick.

83. Here, the Tracking Tools tool on Defendant's Website caused the user's web browser to instantaneously duplicate the contents of the Plaintiff's and Class Members' communications with the Website and would send the duplicate content from the user's browser directly to Meta and Google. The most critical violations include:

    a. **Treatment Specific Tracking/Disclosure**: When a user visited Defendant's Website, the Unauthorized Third-Party Marketing companies each received transmission of full URLs that contained specific fertility treatment information from which medical inferences could be easily drawn, that the user is seeking fertility treatment.

    b. **Form Submission Tracking/Disclosure:** When a user submitted a form to book an appointment, the Tracking Tools created events and records of when users submit fertility appointment request forms.

    c. **Appointment Confirmation Tracking ("Thank You Page") Tracking/ Disclosure:** When a user submitted a form request, the confirmation URL was tracked and disclosed revealing the appointment request was submitted and received.

    d. **Patient Forms and Medical Record Requests Tracking/ Disclosure:** When a user interacted with confidential web forms, the browsing activity and user engagement (clicks) was disclosed and used for re-targeting.

    e. **Patient Portal Link Clicks:** When a user interacted with the portal link the user engagement (clicks) was disclosed and likely used for re-targeting.

**CLASS ACTION COMPLAINT**

84.     Moreover, this content was sent contemporaneously with numerous digital identifiers in the data flow.

85.     Under HIPAA, to be considered "de-identified", ALL 18 HIPAA Identifiers must be removed from the data set.  The intercepted communications contained numerous direct and indirect identifiers and categorically failed the Safe Harbor method in §164.514(b)(2)

86.     Meta and Google can use various cross referencing and algorithmic methods to identify the Plaintiff and Class Members from the uniform and baseline set of disclosed Private Information, including some or all of the following: (1) first-and-third-party user account cookies; (2) first-party device identifiers; (3) IP addresses; (4) user agents; and (5) other device properties.

87.     Without discovery and full disclosure of the complete source code, Plaintiff cannot identify all identifiers at issue, but Plaintiff's investigation indicates that Defendant disclosed identifiable data to both Google and Meta through one or more of the following methods:

**i.       Defendant Disclosed PHI to Meta**

88.     Defendant and Meta collected vast quantities of Plaintiff's and Class Members' Private Information through **Meta Pixel ID: 1192608097478804**. The Meta Pixel was used to track patient browsing activity on highly sensitive pages including (1) schedule appointment, (2) appointment confirmation page, and (3) patient medical forms.

89.     By installing and implementing the Meta Pixel, Defendant caused Plaintiff's and Class Member's Private Information to be intercepted by and/or disclosed to Meta.

90.     Specifically, the Meta Pixel collected and disclosed, at a minimum, a user's sensitive page views communicating the specific URLs[10] to Meta.

---

[10] URLs reveal the exact fertility treatment being researched, directly identifying reproductive health context, and can be sent in combination with direct identifiers. Discovery is needed of full experts and history to evaluate the configurations of both Meta and Google tracking.

**CLASS ACTION COMPLAINT**

91. In combination with the content of the URL, the Meta Pixel also transmitted numerous identifiers that Meta could use to identify the Plaintiff and Class Members, including the following:

| Safe Harbor Item | Data that Meta can use to identify the user |
|---|---|
| Account Numbers | • Facebook: C_User ID when user is logged into the account |
| Device Identifiers | • Facebook_ fbp=fb.; Issues the fbp browser ID that survives future visits whether user logged into account or not<br>• User Agents<br>• Device Properties |
| Web URLs | • URLs contain sensitive page name and sent with identifiers |
| IP address[11] | • Every HTTPS request to Facebook includes the visitor's IP (inherent in network requests) |
| Emails, Names | • Meta Advance Matching configuration may capture along with fields. |

92. First, for users with a Facebook account, Meta could identify those users by cross-referencing the browsing activity, _c_user cookies, with the user's meta profile that would have the user's name, email, phone number, and date of birth. This is regardless of whether the user is logged into the account.

93. Given that Meta has over 253 million users in the United States, the number of patients without a Facebook account is negligible.

94. Second, for users without a Meta account, Meta can still identify those individuals through deterministic or probabilistic matching. These matching processes work by matching browser _fbp_cookie, device IDs, IPs, and user agents with other available data sets that contain the name source to match the user with the other data sets. There are numerous available "identity

---

[11] Meta receives an IP address by default that can be combined with other user agents and device properties to identify a user.

**CLASS ACTION COMPLAINT**

providers "and "media agency solutions" companies that have proven accuracy for matching identifies with devices. LiveRamp, for example, has demonstrated 95-98% accuracy from a sample of 13.6 million devices and 1.4 million devices respectively.

95. Meta pixel also supports advanced matching which is designed to optimize Meta ads and convert more customers. When configured, the advanced matching can share with Meta a user's first name, last name, phone, gender, birthdate, city, state or country, and other form fields depending on the configuration.

96. Defendant, the Unauthorized Third-Party Marketers, and potentially other vendors, are in exclusive control of the full configuration settings related to Advanced Matching and Google Tag Manager configurations that could have revealed direct identifiers as well as additional form fields.

97. At a minimum, and uniformly across the entire Class, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiff's and Class Members' patient status, a protected and valuable piece of medical information.

ii. Defendant Disclosed PHI to Google

98. Defendant and Google collected vast quantities of Plaintiff's and Class Members Private Information through both Universal Analytics and GA4 by tracking what every user communicated to Defendant's website.[12] (UA and GA4 will be collectively referred to as "Google Analytics")

99. The Website was configured with Google Analytics, Google Ads, and Google Tag Manager allowing for tracking across the various pages on the Website and retargeting

---

[12] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel.

**CLASS ACTION COMPLAINT**

advertisement. By installing and implementing Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable.

100. As Plaintiff and Class Members navigated the Website, Google Analytics recorded the exact page and title viewed, and Google Ads would fire conversion trackers marking the user as a potential patient. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiff's and Class Members' patient status.

101. As the Plaintiff and Class Members navigated the Website, Google Analytics would send a special "file download" event to its servers containing: (1) exact file name "facesheet.pdf"; (2) the full URL to the medical form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

102. In combination with the content of the URL, Google Analytics also transmitted numerous identifiers that Google could use to identify the Plaintiff and Class Members, including the following:

| Safe Harbor Item | Data that can be used to Identify Users |
|---|---|
| **Account Identifiers** | • Google _SID/33PSID |
| **Device identifiers / serials** | • GA4 records cid ID and engagement metadata<br>• Google Ads issues auid ID<br>• User agents and device properties |
| **Web URLs** | • URLs contain sensitive page names sent in combination with identifiers. |
| **IP addresses** | • Universal Analytics collected by default<br>• GA4 does not collect |
| **Emails, Names** | • Google Configurations may send URLs with identifiers |

**CLASS ACTION COMPLAINT**

103.    Like Meta, Google Analytics captures specific identifiers that allow Google to link the user's browsing activity on the Website—and the internet in general—with an individual Google Account.

104.    Google can also utilize a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

105.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

106.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[13]

107.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[14] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

108.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[15]

---

[13]    Justin    Schuh,    *Building    a    more    private    web*,    GOOGLE    (Aug.    22,    2019), https://blog.google/products/chrome/building-a-more-private-web/.

[14] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.

15 Yinzhi Cao, Song Li & Erik Wijmans, (CROSS-)BROWSER FINGERPRINTING VIA OS AND HARDWARE LEVEL FEATURES (Network & Distributed Sys. Symp., 2017), available at https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

**CLASS ACTION COMPLAINT**

109. Although Google created these cookies, Defendant is ultimately responsible for the manner in which the Google Analytics was implemented and configured and that its patients and potential patients could be identified via these cookies.

110. Google would not have received Plaintiff's and Class Member's Private Information but for Defendant's implementation, configuration, and use of the Tracking Tools throughout its Website.

111. The specific Google Tracking on the Website included:

    a. **Google Analytics 4 (GA4); Property ID 1: G-FZWYL6CD52 and G-B98KB1NBR4**; the tracking was present on sensitive pages including schedule appointment, confirmation pages, patient forms, and egg freezing. Key events were tracked that included user engagements, and custom conversion events relate to sensitive form submissions Essentially, this tracking allowed Google to know every time a user submitted a form and appointment request and included session IDs, browser fingerprinting metrics, and other identifiers allowing Google to re-identify the user with the browsing activity.

    b. **Universal Analytics (UA): Property ID: UA-177026465-1 and UA-2291691-1** was capturing all pages with pageview events including full URLs and page titles; the tracking included client IDs browser fingerprinting metrics, and other identifiers allowing Google to re-identify the user with the browsing activity on schedule appointment, conformation page, and patient forms.

**CLASS ACTION COMPLAINT**

c. **Google Ads Remarketing: Conversion ID: 874462476** was capturing and sharing conversions through Google DoubleClick to analyze advs viewed or clicked, time spent on pages, and actual conversions (i.e., new patient signups). Based on browsing behavior, DoubleClick helped Defendant build interest-based profiles with inferred interests, ad engagement patterns, and demographic estimates. Pages tracked included appointment scheduling, confirmation thank you page, and patient forms.

d. **Google Tag Manager (GTM): Container ID: GTM-NH692323, GTM-NGPV8S, and GTM-TFN9S7G** was the central dispatcher for GA4, UA, Google Ads, and webform interactions tracking across the entire website. GTM may also have been dispatcher for other Tracking Tools. Through the GTM multiple sensitive events were being tracked and shared including (a) form submissions, (b) link clicks to the patient portal, (c) link clicks to the new patient forms, (d) link clicks for the release of medical records. The three containers allow for maximum flexibility to deploy additional pixels without code change, increasing the risk of inadvertent disclosure of Private Information.

112. Defendant, Google and potentially some of its other vendors are in exclusive control of the full configuration settings related to Google Tools that could have impacted the transmission of specific form fields and other identifiable data. Defendant is also in exclusive control of the configuration within the GTM that could have impacted the role various tags played in the data collection, disclosure and use of Private Information.

**E. The Tracking Technology Was Implemented & Configured on Sensitive Pages of the Website and Resulted in the Disclosure of PHI.**

**CLASS ACTION COMPLAINT**

113. The Tracking Technology was implemented and configured throughout the Website. Some specific examples of the tracking illustrate the privacy violations are discussed below, but this is not the full list of impacted pages on the Website, and discovery is needed to understand the full timeline of implementation, configuration and disclosure of PHI with respect to these pages discussed below, as well as other sensitive pages on the Website.

114. In each of the examples below, the screen shots of network traffic and HAR files demonstrate that the user's website activity, contents of the user's communications, and individual identifiers have been and are currently being sent to Meta and Google as patients navigate and use the Website. These images are simply a sample of the available evidence showing how the collection, disclosure and use of Plaintiff's and Class Members Private Information occurred and continues to occur for active patients and users of the Website.

### i. Homepage

115. Starting with the main entry point for the Website. Visitors arrive here when searching for fertility services, evaluating treatment options, and beginning their reproductive health journey.

116. Upon navigation to the Homepage, the following tracking tools are engaged and fire sending PHI to Meta and Google: Meta Pixel, GA4, Google Ads Remarketing, and Google Tag Manager.

117. **Facebook Pixel** – The Meta Pixel sends PageView events to facebook.com/tr with the Invia Fertility homepage URL and persistent fbp browser identifier:

**RequestURL(truncated):**
https://www.facebook.com/tr/?id=1192608097478804&ev=PageView&dl=https%3A%2F%2Fwww.inviafertility.com&...&fbp=fb.1.1769779322890.183710883338215406&...

**CLASS ACTION COMPLAINT**

*Image 1 is a copy of HAR (CSV Line 2) download and collection completed on January 30, 2026.*

118. In this script, upon visiting the home page, the Meta Pixel sends the page title in combination with the unique fbp=fp identifier tying the visitor's browsing activity to the fertility clinic.

119. **Google Analytics 4 –** Two Google properties receive user_engagement and pageview events with page title "Premier Fertility Center in Chicago IL| Invia Fertility" with engagement meta data allowing Google to know when the user returns to the site.

120. **Google Ads Remarketing –**Google Ads and DoubleClick were triggered to with the "auid" identifier with page title "Premier Fertility Center in Chicago| Invia Fertility" enabling remarketing without consent and demonstrating the intentional use of patient data for the re-marketing of reproductive health provider visit

> **RequestURL(truncated):**
> https://googleads.g.doubleclick.net/pagead/viewthroughconversi
> on/874462476/?...&url=https%3A%2F%2Fwww.inviafertility.com%2F&
> ...&tiba=Premier%20Fertility%20Center%20in%20Chicago%20IL...&a
> uid=262826100.1769779318...

*Image 2 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

121. **Google Tag Manager –** Three Google Tag Managers fire multiple events and orchestrates all tags.

122. Although the homepage does not explicitly name a specific fertility condition, it establishes that the user has visited a reproductive health provider's website, which can become PHI when combined with specific identifiers–e.g., persistent identifiers "fbp-fb" and "auid" shown in the code above—allowing Defendant the ability to engage in long-term tracking of patients evaluating fertility treatment options.

*ii. Schedule Appointment Page*

**CLASS ACTION COMPLAINT**

123. The page located at www.inviafertility.com/schedule-appointment is the appointment scheduling interface ("Appointment Page") where prospective patients begin the process of booking fertility consultations. This is one of the most sensitive pages on the Website as its purpose is for active treatment seeking behavior. The page contains a prominent contact web form for new and returning patients to complete and submit requests to be contacted to schedule medical appointments. The page also includes a link for financing, a link to the patient portal, and link to patient medical forms.

124. Visitors to the Appointment Page are actively seeking to schedule fertility treatment medical services which is information related to the user's medical condition and provision of medical care and constitutes PHI under HIPAA.

125. Upon navigation to the Appointment Page, the following tracking tools are engaged and fire sending PHI to Meta and Google: Meta Pixel, GA4, Google Ads Remarketing, and Google Tag Manager.

126. **Facebook Pixel** -- In the image below, the network traffic shows the data flow from the Appointment Page to Meta communicating to Meta that the user is viewing and interacting with the Appointment Page. Without discovery on configurations, Plaintiff and Class Members cannot know the full extent of data shared with Meta from the activity on the Appointment Page.

**CLASS ACTION COMPLAINT**



*Image 3 is a screenshot taken of network activity on April 2, 2026.*

127.    At a minimum, the Image shows the persistent identifier is present as fb.1.1771862860415.403366669843824826 along with the URL.

128.    The following excerpts from the HAR files further confirm that the Tracking Tools were transmitting PHI to Meta. In the following image, the persistent fb identifier is different because the dataflow was downloaded from a different browser. The two different downloads taken at two different times with two different browsers shows how the Pixel assigns unique IDs to different browsers from which individuals can be identified.

- **Request URL (truncated)**
```
https://www.facebook.com/tr/?id=1192608097478804&ev=PageView&dl=h
ttps%3A%2F%2Fwww.inviafertility.com&rl=https%3A%2F%2Fwww.inviafer
tility.com&if=false&ts=1769779345260&sw=1800&sh=1169&v=2.9.255&r=
stable&ec=0&o=12316&fbp=fb.1.1769779322890.18371088333821540 6&pm.
.. =GET
```

*Image 4 is an excerpt from a HAR file downloaded and collected on January 30, 2026*

129.    **Google Ads Remarketing -** Google Ads and DoubleClick were triggered with the "auid" identifier with page title "Schedule an Appointment Chicago Illinois| Invia Fertility" enabling

**CLASS ACTION COMPLAINT**

remarketing without consent and demonstrating the intentional use of patient data for the re-marketing of reproductive health provider visit.



*Image 5 is a screen shot of the network traffic and payloads showing the "auid" Identifier as 14945950115.1775236992 taken on April 3, 2026.*

130.    The following excerpts from the HAR files further confirm that the Tracking Tools were transmitting PHI to the Unauthorized Third-Party Marketers. Like the Meta "fbp" identifier, the images show different persistent "auid" identifier because the code was downloaded from two

- 33 -

different browsers. The variation in unique assignment shows how the Google Remarketing Tools assigns unique IDs to different users for profile building.

**Request URL (truncated)**

```
https://googleads.g.doubleclick.net/pagead/viewthroughconversion/874462
476/?... www.inviafertility.com%2Fschedule-
appointment&ref=https%3A%2F%2Fwww.inviafertility.com%2F&frm=0&tiba=Sche
dule%20an%20Appointment%20Chicago%20Illinois%20%7C%20InVia%20Fertility&
hn=www.googleadservices.com&npa=auid=262826100.1769779318...
```

*Image 6 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

131. **The Google Tag Manager** was also capturing "formsubmit" events that tracked and disclosed to Google and created records for patients' specific appointment requests.

```
Element: <form autocomplete='off' id='fsForm5626581'
method='post'...
```
**Form URL:** `https://firstfertility.formstack.com/forms/index.php`
Image

132. Without discovery, the information is limited as to whether more specific form field data was transmitted to Meta or Google through specific configurations like Advanced Matching on Meta.

### iii. Patient Forms and Consent Document Page

133. The page located at www.inviafertility.com/patient-forms-consent provides patient forms and consent documents ("Patient Form Page") for fertility treatment. Visitors to this page are likely established or patients who have scheduled appointments who are reviewing, downloading and submitting clinical paperwork.

134. Upon navigation to the Patient Form Page, the following tracking tools engage and fire sending PHI to Meta and Google: Meta Pixel, GA4, Google Ads, and GTM.

135. The Tracking Tools on the Patient Form Page reveal to Meta and Google that the patient is interacting with actual intake process or other medical appointment activity.

**CLASS ACTION COMPLAINT**

136. **Meta Pixel** – The Meta Pixel was capturing and transmitting, at a minimum, Page View events. The images below show the configuration settings allowing the unlawful disclosure and the actual network data flow to Meta as a patient navigates to the Patient Form Page.



*Image 7 is a screenshot of network traffic showing data flowing with persistent identifier* fb.1.1771862860415.403366669843824826 *to Meta through the Meta Pixel on April 2, 2026.*

137. And the following JSON excerpt further confirms that the Meta Pixel was transmitting PHI to Meta along with a unique persistent identifier.

**URL Request (Truncated)**

```
https://www.facebook.com/tr/?id=1192608097478804&ev=PageView&dl=https%3
A%2F%2Fwww.inviafertility.com&rl=https%3A%2F%2Fwww.inviafertility.com&i
f=false&ts=1769779451067&sw=1800&sh=1169&v=2.9.255&r=stable&ec=1&o=1231
6&fbp=fb.1.1769779322890.18371088333215406... GET
```

*Image 8 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

138. **Google Ads Remarketing** – Google Ads was capturing user conversions with page title. Image 9 below shows the data flow with the unique "auid" identifier along with browsing fingerprint data.

**CLASS ACTION COMPLAINT**

```
www.inviafertility.com%2Fpatient-forms-
consentsyou&frm=0&tiba=Patient%20Forms%20and%20Consent%20Documents%
20%7C%20Invia%20Fertility&hn=www.googleadservices.com&npa=0&pscdl=n
oapi&
auid=262826100.1769779318&uafvl=Not(A%.0.0%7CChromium%3B144.0.7559.
97%7CGoogle%2520Chrome%3B144.0.7559.97&uamb=0&uam=&uap=macOS&uapv=2
6.3.0&uaw=0&_tu=CA&rfmt=3&fmt=4
```

*Image 9 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

139. **Google Tag Manager** – GTM captures LinkClick events communicates to Google that the user is engaging in actual patient intake process and medical release forms for the following events:

    a. Click_ "New Patient Requirements" forms
    b. Click_ "Authorization Form for Release of Confidential Health Information"
    c. Click_ "Patient Portal" log in link

140. **Google Analytics 4** was also capturing PageView, user engagement, and other custom events.

141. Without discovery, the limited information cannot determine what additional Private Information may have been transmitted to Google or Meta from the actual forms that were being completed.

### iv. Fertility Treatment Option Page

142. The page located at www.inviafertility.com/treatment-options ("Fertility Treatment Page") is one of the most sensitive pages on the Website, explicitly listing fertility treatment options including infertility testing, IVF, infertility diagnosis, female and male infertility treatment, and other treatment options. There is a submission form for new patient appointments prominently displayed.

143. Upon navigation to the Fertility Treatment Page, the following tracking tools engage and fire sending PHI to Meta and Google: Meta Pixel, GA4, Google Ads, and GTM.

**CLASS ACTION COMPLAINT**

144.	Users interacting with the Fertility Treatment page are likely initiating a patient relationship or current patients inquiring about fertility treatment options. This intent is shared with six advertising platforms before any form submission occurs.

145.	**Meta Pixel –** The Meta Pixel was capturing and transmitting, at a minimum, Page View events. The image below shows the configuration settings allowing the unlawful disclosure and the actual network data flow to Meta as a patient navigates to the Fertility Treatment Page.



*Image 10 is a screenshot of network traffic showing data flowing with persistent identifier* fb.1.1771862860415.403366669843824826 *to Meta through the Meta Pixel on April 2, 2026.*

#### v. *Appointment Request Thank You Confirmation Page*

146.	As a user navigated the Website, they were presented with Request for Appointment forms or links on virtually every page of the Website.

147.	When a patient or prospective patient submits the form, the submission is tracked as discussed above, and they are re-directed to https://www.inviafertility.com/appointment-

**CLASS ACTION COMPLAINT**

request-thank-you ("Appointment Confirmation Page") advising them that the Defendant received the request and would be in "touch shortly to schedule your initial consultation."[16]

148. The Appointment Confirmation Page's purpose is for patients who have completed treatment initiation from the Website. The confirmation page is direct evidence that that user has successfully requested fertility treatment, as opposed to a user just browsing for information, and it is the most heavily tracked page based on the current available information.

149. As a user is re-directed to the Appointment Confirmation Page after submitting an appointment form, the Tracking Tools are engaged and disclose to Meta and Google that the individual has requested fertility services.

150. The specific Tracking Tools included the Meta Pixel, GA4, Google Ads, UA, and GTM.

151. **Meta Pixel –** The Meta Pixel was capturing and transmitting, at a minimum, Page View events. The images below show the configuration settings allowing the unlawful disclosure and the actual network data flow communicating to Facebook that a specific use has confirmed an appointment request.

---

[16] https://www.inviafertility.com/appointment-request-thank-you (last visited Apr. 2, 2026).

**CLASS ACTION COMPLAINT**



*Image 11 is a screenshot of network traffic showing data flowing with persistent identifier* fb.1.1771862860415.403366669843824826 *to Meta through the Meta Pixel on April 2, 2026.*

152. **Google Analytics (GA4)** – Google Analytics was capturing page_view, user_engagement, and critically **conversion events**. The technical excerpts below further show the specific data flow from the page along with the unique "cid" identifier and browser fingerprinting allowing Google to relate the data with a specific individual:

### GA4 -Page View

**Request URL**
```
https://analytics.google.com/g/collect?v=2&tid=...
cid=1290177292.1769779317&ecid=2120900440&ul=en-
us&sr=1800x1169&uaa=arm&uab=64&uafvl=Not(A%253ABrand%3B8.0.0.0%7CChromium%3B1
44.0.7559.97%7CGoogle%2520Chrome%3B144.0.7559.97&uamb=0&uam=&uap=…
www.inviafertility.com%2Fappointment-request-thank-
you&dr=https%3A%2F%2Fwww.inviafertility.com%2Fschedule-
appointment&dt=Thank%20You%20for%20Requesting%20an%20Appointment%20Chicago%2C
%20IL%20%7C%20InVia%20Fertility&en=page_view&tfd=1101
```

*Image 12 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

### GA4 -Form Submission Conversion Event

**Request URL**
```
https://www.google-analytics.com/privacy-sandbox/register-
conversion?_c=1&cid=1290177292.1769779317&dbk=25110701423982422&dma=0&en=sc_
```

**CLASS ACTION COMPLAINT**

<mark>form_submission</mark>&gcs=G111&gtm=45je61r1v885079528z89138569747za20gzb72470112zd7
2470112&npa=0&tid=G-B98KB1NBR4&dl=https%3A%2F%2Fwww.inviafertility.com%3F

*Image 13 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

**GA4 -Side Form Submit Event**

**Request URL**
https://www.google-analytics.com/privacy-sandbox/<mark>register-
conversion?_c=1&cid=1290177292.1769779317</mark>&dbk=6132594485259517632&dma=0&en=<mark>si
de_form_submit</mark>&gcs=G111&gtm=45je61r1v885079528z89138569747za20gzb72470112zd72
470112&npa=0&tid=G-B98KB1NBR4&dl=https%3A%2F%2Fwww.inviafertility.com%3F

*Image 14 is an excerpt from a HAR file downloaded and collected on January 30, 2026.*

153. **Google Ads Remarketing** – Google Ads was also capturing conversions notifying Google of successful appointment requests. *See supra* Image 14.

154. **Google Tag Manager** – GTM configured to track multiple events including element visibility tracking and if the user clicked on the link for "Patient Portal".

### *vi. Patient Portal Login/Authentication Page*

155. As reflected in the collection of images below, Plaintiff's pre-suit investigation also confirms that Tracking Technology was operating on the login/authentication page of Defendant's Patient Portal.

156. Specifically, GA4 fires on https://portal.inviafertility.com/PatientPortal for both GA4 properties and the user's id carries over from the main marketing site to the portal.

157. This means that Google can link a user's browsing on the general Website to their authenticated portal activity using the same session identifier.

158. The images directly below show that the Tracking Technology is operating as explained above on the unauthenticated portion of Defendant's Website, inviafertility.com :

**CLASS ACTION COMPLAINT**



*Image 15 is a screenshot from inviafertility.com collected on April 23, 2026*

*showing network traffic.*

159.    The image below is a zoomed in image of the highlighted area, which shows a

Google cid of 2076553501.1772807360, which is also highlighted in blue:

| ▼ Request Headers | |
|---|---|
| :authority | www.google-analytics.com |
| :method | POST |
| :path | /j/collect?<br>v=1&_v=j102&a=1604808828&t=pageview&_s=1&dl=https%3A%2F%2Fwww.inviafertility.co<br>m%2F&dr=https%3A%2F%2Fwww.google.com%2F&ul=en-<br>us&dt=Premier%20Fertility%20Center%20in%20Chicago%20IL%20%7C%20InVia%20Fertility<br>&sr=1920x1080&vp=1028x945&_u=CACAAEABEAAAACAAI~&jid=145247319&gjid=86033<br>0104&cid=2076553501.1772807360&tid=UA-2291691-<br>1&_gid=234147657.17769599628&_r=1&_slc=1&z=1187306683 |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Content-Length | 0 |
| Content-Type | text/plain |
| Cookie | ar_debug=1 |
| Origin | https://www.inviafertility.com |
| Pragma | no-cache |
| Priority | u=1, i |

**CLASS ACTION COMPLAINT**

*Image 16 is a zoomed in portion of the network traffic portion of the screenshot from inviafertility.com collected on April 23, 2026.*

160.    The highlighted portion of the image shows the Google cid of 2076553501.1772807360 displaying in the network traffic, which confirms that the Tracking Technology is executing as described previously.

161.    The Google cid of 2076553501.1772807360 represents that particular user's identity.[17]

162.    As explained above, that Google cid value is transmitted to Google.

163.    Once a user of the Website selects the "Patient Portal" link on Defendant's Website, a separate webpage is loaded for the url, https://portal.inviafertility.com/PatientPortal, in a separate browser tab.

164.    As seen in the images below, Google Analytics continues to operate on the Patient Portal webpage as the network traffic shows the presence of the Google Analytics tracker under the same cid as from the main Website:

---

[17] The Google cid value here is different than in other images because it was a different user from a different computer performing the investigation.

**CLASS ACTION COMPLAINT**



*Image 17 is a screenshot from portal.inviafertility.com/PatientPortal collected on April 23, 2026 showing network traffic.*

165. The image below is a zoomed in image of the highlighted area of the patient portal screenshot, which shows a Google cid of 2076553501.1772807360, which is also highlighted in blue:



*Image 18 is a zoomed in portion of the network traffic portion of the screenshot from portal.inviafertility.com/PatientPortal collected on April 23, 2026.*

**CLASS ACTION COMPLAINT**

166. Once again, the same Google cid of 2076553501.1772807360 is displayed, which shows that Defendant's Patient Portal webpage is transmitting the identity of the user to Google.

167. When the user clicks "Sign In" on the Patient Portal webpage, it brings the user to another url : https://portal.inviafertility.com/PatientPortal/Signin.

168. The image below is a similar screenshot taken of the Signin page, https://portal.inviafertility.com/PatientPortal/Signin, showing the network traffic:



*Image 19 is a screenshot from portal.inviafertility.com/PatientPortal/Signin collected on April 23, 2026 showing network traffic.*

169. The image below is a zoomed in image of the highlighted area of the Sign In webpage screenshot, which, consistent with this series of images, shows a Google cid of 2076553501.1772807360, which is also highlighted in blue:

**CLASS ACTION COMPLAINT**

| Accept-Language | en-US,en;q=0.9 |
|---|---|
| Cache-Control | no-cache |
| Cookie | _gcl_au=1.1.305502040.1772807361; _fbp=fb.1.1772807366171.37000206976812016; hubspotutk=8f7f15be1a5c024e60baee19d99d03c2; __hs_cookie_cat_pref=1:true_2:true_3:true; _gid=GA1.2.234147657.1776959962; _ga_FZWYL6CD52=GS2.1.s1776959961$o2$g1$t1776961085$j16$l0$h0; _ga=GA1.1.2076553501.1772807360; _ga_B98KB1NBR4=GS2.1.s1776959962$o2$g1$t1776961087$j14$l0$h125393508; __hstc=52573303.8f7f15be1a5c024e60baee19d99d03c2.1772807366376.1776959967827.1776961092679.3; _hssrc=1; ASP.NET_SessionId=2xxra4sjyhd0pgjg4dcpu5mb; invoca_session=%7B%22ttl%22%3A222026-05-23T17%3A47%3A13.967Z%22%2C%22session%22%3A%7B%22invoca_id%22%3A%22i-6f658d8b-688c-418c-c704-3f6be4e47bfe%22%7D%2C%22config%22%3A%7B%22ce%22%3Atrue%2C%22fv%22%3Afalse%2C%22m%22%3Afalse%7D%7D |
| Pragma | no-cache |
| Priority | u=0 i |

*Image 20 is a zoomed in portion of the network traffic portion of the screenshot from*

*portal.inviafertility.com/PatientPortal/Signin collected on April 23, 2026.*

170. Just like the other webpages involving Defendant's Website and Patient Portal webpages, the same Google cid of 2076553501.1772807360 is displayed, which shows that even the user's presence on the Sign In screen is being transmitted to Google, in addition to the user's unique identity.

171. Discovery will be necessary to determine whether Defendant continued to transmit a user's activity within the Patient Portal after the user signed in.

**F. Defendant Was Enriched and Benefitted from the Use of the Tracking Technology and Private Information Had Financial Value**

172. The Tracking Tools served the sole purpose of bolstering Defendant's profits via marketing and advertising.

173. In exchange for bartering away its patient list and disclosing the Private Information of its patients, Defendant was enriched through the more cost-efficient and profitable marketing.

174. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

**CLASS ACTION COMPLAINT**

175.    By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

176.    Following the interception of the Private Information, Meta's powerful AI and machine learning systems would also use the Plaintiff's and Class Members's Private Information that was collected from Meta Pixel on a Website to build profiles and audiences for Defendant and other advertisers. The Private Information could be used to learn and predict which users are more likely to convert and complete a request for appointment, and the Meta tools allowed for campaigns that would automatically target those potential patients to maximize the ad spend.

177.    While Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiff's and Class Members browsing activity and Private Information collected from the Website.

178.    Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the Patients, Class Members, and Defendant lose control over its usage and distribution.

179.    Defendant's disclosure of Private Information harmed Plaintiff and Class Members by collecting valuable data without paying Plaintiff or Class Members for the use of the Private Information. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is expected to continue to increase and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

180.    The value of health data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar

**CLASS ACTION COMPLAINT**

Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.[18]

181. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[19] Accordingly, patient data that can be linked to a specific individual is even more valuable

182. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

183. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information

184. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[20]

---

[18] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

[19] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[20] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data,* SECURELINK (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

**CLASS ACTION COMPLAINT**

185. Personal information has private value beyond its use as a bare commodity.[21] The value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing.[22] This research has approached the valuation of personal information from multiple perspectives:

a. The amount one would accept to relinquish their data;

b. The amount one would spend to protect their data;

c. The potential harm from data exposure; and

d. The benefit a data holder could gain from acquiring data. [23]

186. These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status

187. In addition, numerous services exist that charge fees to monitor and remove personal information from data brokers and search databases. For example, Privacy Bee charges between $96 and $804 per year (depending on the features selected by the user).[24] Other similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year,[25] which charges one-time fees ranging from $99 to $500 for search

---

[21] *See, e.g.*, Wagner, et. al (2018); Alessandro Acquisti et al, *The Economics of Privacy*, 54 JOURNAL OF ECON. LITERATURE 442 (2016); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021).

[22] Fehrenbach David & Carolina Herrando, *The Effect of Customer-Perceived Value When Paying for a Product With Personal Data: A Real-Life Experimental Study*, 137 J. OF BUS. RES. 222 (2021); Xiao-Bai Li et al, *Valuing Personal Data with Privacy Consideration*, 52 DECISION SCI. 393 (2021); Alorwu, et al. (2024).

[23] Alessandro Acquisti, et al., *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 442 (2016).

[24] *Pricing and License Cost*, PRIVACY BEE, https://privacybee.com/pricing/ (last visited Apr. 22, 2026).

[25] *Privacy Protection Plans - JoinDeleteMe*, DELETEME®, https://joindeleteme.com/privacy-protection-plans/#2-years (last visited Aug. 26, 2025).

**CLASS ACTION COMPLAINT**

engine and data breach removals,[26] and Incogni.com which charges between $95.88 (individual plan) and $275.88 (family plan) per year to remove information from major data broker websites and search databases.[27] These provide a baseline market valuation of personal information.

**G. Data Broker Ecosystem**

188. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[28]

189. Data brokers combine online and offline data to markets to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks. [29]

190. Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third-party marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumer's activities, a data broker can combine the data sets to form a more detailed profile of the consumer's life.

191. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve

---

[26] *Services Pricing*, DELETEME™, https://www.deleteme.com/pricing-update/ (last visited Aug. 26, 2025).

[27] *About Us*, INCOGNI, https://incogni.com/about-us (last visited Apr. 22, 2026).

[28] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, Fed. Trade Comm. (May 27, 20214), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.

[29] *Id*.

**CLASS ACTION COMPLAINT**

as pivotal components in the data broker eco system by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.

192. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on websites such as Defendant's.

193. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or response to pharmaceutical ads or other treatment ads. These predictive models are then sold and used for targeted advertising.

194. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

195. However, it is indisputable that the data at issue, given it is medical data, is highly valuable for segmentation and profile building and retargeting individuals based on their browsing histories.

## H. Defendant Violated HIPAA and Industry Standards.

196. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes,***

**CLASS ACTION COMPLAINT**

*without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.*[30]

197. In other words, the HHS has expressly stated that entities who implement Tracking Tools, such as Defendant, have violated HIPAA Rules unless they have obtained a HIPAA-complaint authorization from their patients.

198. The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[31]

199. In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[32]

---

[30] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 26, 2025) (emphasis added).
[31] *Id.*
[32] *Re: Use of Online Tracking Technologies*, U.S. DEPT. OF HEALTH & HUM. SERVS. AND FED. TRADE. COMM'N (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

**CLASS ACTION COMPLAINT**

200. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[33]

201. The HIPAA Privacy Rule, 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[34]

202. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103

203. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

204. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could

---

[33] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[34] *HIPAA For Professionals*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/index.html (last visited Aug. 26, 2025).

**CLASS ACTION COMPLAINT**

be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

e. Names;

***

f. Medical record numbers;

***

g. Account numbers;

***

h. Device identifiers and serial numbers;

i. Web Universal Resource Locators (URLs);

j. Internet Protocol (IP) address numbers; … and

k. Any other unique identifying number, characteristic, or code…; and" The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

205. The HIPAA Privacy Rule requires any "covered entity"—which includes pharmacies—to maintain appropriate safeguards to protect the privacy of protected health

**CLASS ACTION COMPLAINT**

information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

206. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d–1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

207. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

208. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

209. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this

**CLASS ACTION COMPLAINT**

information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[35]

210. In its guidance for Marketing, HHS further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[36]

211. As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using Tracking Tools.[37]

212. The Bulletin expressly provides that "[r]egulated entities are not permitted to use Tracking Tools in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

213. Defendant's actions violated HIPAA Rules.

**I. Defendant Violated Illinois Law**

---

[35] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[36] *Marketing*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[37] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (rev. June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**CLASS ACTION COMPLAINT**

214. Illinois has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

215. Illinois law provides that all patients are entitled to privacy and confidentiality with respect to their treatment and medical records: "A patient has the right to privacy and confidentiality in health care." 215 ILCS 134/5.

216. Illinois common law recognizes a physician's fiduciary "duties preclude the physician from disclosing confidential information about his patient to third parties without his patient's express authorization other than through court-authorized discovery means." *Baylaender v. Method*, 230 Ill. App. 3d 610, 621, 594 N.E.2d 1317, 1324 (1992) citing *Petrillo v. Syntex Lab'ys, Inc.*, 148 Ill. App. 3d 581, 499 N.E.2d 952 (1986).

217. Defendant's actions described herein violated Illinois law.

**J. Plaintiff and Class Members Common Experience**

218. Plaintiff and Class Members are Defendant's patients who reside nationwide and in the State of Illinois and received healthcare services from Defendant since Defendant implemented Tracking Tools on its Website to the present. As part of the medical services, Plaintiff and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiff and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

219. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

**CLASS ACTION COMPLAINT**

220. Plaintiff and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

221. Plaintiff and Class Members were Facebook and/or Google users.

222. As Plaintiff and Class members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiff's and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiff's and Class Members' Private Information to the Unauthorized Third Parties.

223. Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiff and Class Members with their Private Information.

224. Furthermore, following the disclosure, Plaintiff and Class Members Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "look- a-like audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

225. Once released to the digital marketing ecosystem, Plaintiff and Class Members lost control of the Private Information the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

226. Plaintiff and Class Members were not compensated for the use of their valuable Private Information in marketing campaigns.

**CLASS ACTION COMPLAINT**

227.     Upon information and belief, Defendant monetized Plaintiff's and Class Members' Private Information by building custom and look-a-like audiences to target and re-target patients and potential patients and donors. By utilizing the Unauthorized Third-Party Marketer's tools, Defendant was able to save substantial marketing costs while increasing its cost per conversion, as well as likely increasing its overall new patient conversion.

### K. Plaintiff M.G.'s Representative Experience

228.     Plaintiff's experiences using the Website is representative of the Class she seeks to represent.

229.     As a patient of Defendant, and with the encouragement of Defendant, from 2018 through 2022, Plaintiff frequently accessed Defendant's Website and related App on her computer and/or mobile device for the purpose of researching fertility treatment options, communicating with physicians, and completing medical forms. She also initiated her care and treatment by completing a new patient form on the Website.

230.     As Defendant's patient, Plaintiff paid for medical services and in exchange, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to a third party or utilized for marketing purposes without her consent.

231.     Furthermore, at all times that she utilized the Website, Plaintiff was an Illinois resident and had an active Facebook account.

232.     Plaintiff used Defendant's Website for a variety of medical services, and she visited one or more of the sensitive pages listed above that contained the Tracking Tools.

233. Specifically, she submitted confidential medical information and engaged in confidential communications through Defendant's Website, including, one or more of the following:

a.  Logging into the patient portal,

b.  Requesting and booking appointments,

c.  Researching medical conditions and symptoms through search functions

d.  Searching and researching specific physicians

e.  Utilizing the chat features when communicating medical concerns

f.  Contacting her physician

g.  Completing confidential web forms

h.  Reviewing test results

i.  Ordering medical records

234. In doing so, she communicated her PHI, including her specific medical symptoms and conditions, the fact that she was booking an appointment, and the fact that she was seeking and received medical treatment for infertility.

235. As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, unauthorized third parties obtained Plaintiff's Private Information. The specific information Facebook and Google received, at a minimum, that she was in fact a medical patient seeking infertility treatment and received medical treatment from Defendant. Based on the type of treatment sought, and the URLS transmitted, both Facebook and Google could likely infer specific medical diagnosis as well.

236. Plaintiff has had a Facebook account since approximately 2006 and has regularly used the platform since creating her account. Plaintiff also has had an Instagram account since

**CLASS ACTION COMPLAINT**

2017 that she has used regularly for at least the past five years. Plaintiff accesses each of these accounts multiple times every week. Plaintiff also has a Google account.

237. Plaintiff primarily accesses her Facebook, Instagram, and Google accounts via her smartphone, laptop, and desktop, all of which she used to access Defendant's Website.

238. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook, and this data included her PII, PHI, and related confidential information. Specifically, Plaintiff has communicated her name, date of birth, address, phone number, email address, insurance information, medical history, medical symptoms, and payment information through Defendant's digital platform. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

239. As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed her Private Information to Defendant.

240. During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook and Google, to receive, access or interpret such information for marketing or any other purpose.

241. Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff's Private Information to third parties, such as Facebook and Google.

242.     Following her visits to Defendant's Website, Plaintiff observed targeted advertisements on her Facebook account and Instagram related to the treatments she sought and received through medical providers she viewed on Defendant's Website. The targeted ads included InVia specific targeted advertisement.

243.     The disclosure of Plaintiff's healthcare information, particularly information that she otherwise kept private has caused Plaintiff significant injury. This wanton disclosure of such personal information would be highly offensive to the typical person, as it is to Plaintiff.

**L. Class Wide Injuries, Damages, and Remedies**

244.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of contract, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, loss of benefit of the bargain as part of their payment for medical services, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

245.     Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal.

246.     Plaintiff also seeks consequential and future damage for reasonable and necessary data monitoring services including data broker, as well as the cost of removing the disclosed data and profiles from data broker networks.

**CLASS ACTION COMPLAINT**

247.     Plaintiff further seeks restitution and disgorgement of profits or cost savings obtained from the improper use and misappropriation of Plaintiff's and Class Members' Private Information.

248.     Finally, Plaintiff seeks injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

249.     The injunctive relief sought includes:

   a.   Removal of the Tracking Tools from sensitive parts of the Website;

   b.   Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

   c.   Deletion of all audience profiles and campaigns built from data gathered from the Tracking Tools and built from Plaintiff's and Class Member's Private Information;

   d.   Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

   e.   Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

   f.   Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

   g.   Notice to Class of the unlawful disclosure and misuse of the Private Information.

   h.   Other relief as ordered by the Court.

**CLASS ACTION COMPLAINT**

**TOLLING**

250.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Google and Facebook because Defendant kept this information secret.

**CLASS ACTION ALLEGATIONS**

251.    Class Definition: Plaintiff brings this action on behalf of themselves and other similarly situated individuals defined as follows:

> **Nationwide Class:** United States citizens who, during the class period, were patients of Defendant and used Defendant's Website to access the patient portal, or completed a webform, or completed a new patient form.
>
> **Illinois Sub-Class:** All Illinois residents who, during the Class Period, were patients of Defendant and used Defendants' Website to access the patient portal, or completed a webform, or completed a new patient form.

252.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

253.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

254.    Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

255.    **Numerosity.** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to

Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' business records.

256. **Commonality & Predominance.** Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

a. Whether the Website surreptitiously tracked PII, PHI, and related confidential communications and simultaneously disclose(d) that Private Information to Meta and Google;

b. Whether InVia intentionally tapped the lines of internet communication between patients and their medical providers

c. Whether Meta, or Google are third-party eavesdroppers;

d. Whether InVia's disclosures of PII, PHI, and related confidential communications constitute an affirmative act of communication;

e. Whether Invia's conduct, which allowed third parties to view, collect, aggregate, and monetize Plaintiff's and Class Members' PII and PHI, resulted in a breach of confidentiality;

f. Whether InVia violated Plaintiff's and Class Members' privacy rights by using Tracking Tools to communicate patients' Private Information to Meta and Google,

g. Whether InVia violated Plaintiff's and Class Members' privacy rights by using Plaintiff's and Class Members' Private Information in marketing tactics

**CLASS ACTION COMPLAINT**

and campaigns without Plaintiff's and Class Members' expressed written consent.

    h.   Whether InVia violated HIPAA by failing to obtain expressed written consent from Plaintiff and Class Members before disclosing and using the Private Information for marketing purposes;

    i.   Whether Plaintiff and Class Members are entitled to statutory damages under the ECPA.

    j.   Whether Plaintiff and Class Members are entitled to restitution or disgorgement of profits from the unauthorized use of their Private Information for marketing purposes;

257. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the Class Members, and her claims are typical of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

258. **Appropriateness**. The likelihood that individual members of the Class prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

259. **Ascertainability**. The Class can be identified through Defendant's business records including portal logs, appointment requests, phone logs, webform record submissions, and other records documenting Class Members use and interaction on the Website.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2511(1) et seq.

**CLASS ACTION COMPLAINT**

**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Nationwide Class)**

260. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

261. The ECPA protects both sending and receipt of communications.

262. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

263. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website, Patient Portal, and App qualify as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

264. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

265. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website, Patient Portal, and App with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

266. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

267. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

**CLASS ACTION COMPLAINT**

other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

268.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

269.    Whenever Plaintiff and Class Members interacted with Defendant's Website Patient Portal, and App, Defendant, through the Tracking Pixel imbedded and ran on its Website, Patient Portal, and App, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

270.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Patient Portal, and App, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to

know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

271. Whenever Plaintiff and Class Members interacted with Defendant's Website, Patient Portal, and App, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

272. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

273. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

274. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

275. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

**CLASS ACTION COMPLAINT**

276. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

277. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

278. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

279. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

280. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

281. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

282. Defendant's acquisition of patient communications that were used and disclosed to the Unauthorized Third-Party Marketers was done for purposes of committing numerous criminal and tortious acts in violation of the laws of the United States and Illinois, including.

    a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    b. 45 CFR § 164.508(a)(1);

    c. 15 U.S.C. § 45, et seq.;

    d. 215 ILCS 134/5.

**CLASS ACTION COMPLAINT**

e. Unjust enrichment

f. Breach of contract

g. Breach of Fiduciary Duty

h. Invasion of Privacy.

283. First, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

284. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

285. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

d. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

e. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

286. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Tracking Tool source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

287. The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

**CLASS ACTION COMPLAINT**

288. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

289. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their individually-identifiable patient health information on its Website, Patient Portal, and App because it used its participation in these communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

290. Defendant accessed, obtained, disclosed, used Plaintiff's and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

291. As such, Defendants cannot viably claim any exception to ECPA liability.

292. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional

**CLASS ACTION COMPLAINT**

distress;

b.  Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c.  Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, building more reliable audiences, and running more efficient marketing campaigns without providing any value or benefit to Plaintiff or the Class Members;

d.  Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.  Plaintiff's and Class Members' lost control and value of their PII and PHI due to Defendant utilizing their Private Information for marketing without their consent.

f.  Plaintiff and Class Members are suffering ongoing financial harm derived from the continued interception and misuse of their Private Information.

g.  Class Members have not been notified of the privacy violations and misuse of their Private Information.

293.    Plaintiff, individually and on behalf of the putative Class, seeks legal and equitable remedies to address and rectify the conduct described herein and are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**CLASS ACTION COMPLAINT**

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiff and the Nationwide Class)**

294. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

295. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information.

296. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

297. Plaintiff's and Class Members performed their part of the implied contract by providing their Private Information and/or paying for medical services that they received from Defendant.

298. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

299. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to the Un-authorized Third-Party Marketers without consent.

300. Defendant further breach the implied contracts by using Plaintiff's and Class Members' Private Information without consent.

301. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information (including the fair market value of that information), misappropriation and misuse of their Private

**CLASS ACTION COMPLAINT**

Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

302. Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiff further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## COUNT III
### UNJUST ENRICHMENT
**(On behalf of Plaintiff and the Class)**

303. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

304. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

305. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

306. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

**CLASS ACTION COMPLAINT**

307. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members for the use of the Private Information.

308. The financial benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiff's and Class Members' Private Information as alleged in this Complaint.

309. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiff and the Class, Defendant should be compelled to provide to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiff and Class Members on a pro-rata basis.

310. Alternatively, Defendant should be compelled to provide restitution to Plaintiff and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

311. Furthermore, Plaintiff seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse Plaintiff's and Class Member's Private Information.

## COUNT IV
### VIOLATION OF Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")
### 815 Ill. Comp. Stat. 505/1 et seq.
### (On Behalf of Plaintiff and the Illinois Sub-Class)

312. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

313. Plaintiff and the Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiff, the Class, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

314. Defendant engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

315. Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (1) failing to properly disclose Defendant's use of Tracking Tools as explained above; (2) failing to obtain written authorization from Plaintiff and Class Members to disclose their Private Information to unauthorized third parties; and (3) failing to disclose or omitting materials facts to Plaintiff and the Class about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Private Information of Plaintiff and the Class.

316. These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff and the Class and defeat their reasonable expectations about the security of their Private Information.

**CLASS ACTION COMPLAINT**

317.    Defendant intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

318.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

319.    As a result of Defendant's wrongful conduct, Plaintiff and the Class were injured in that they never would have provided their Private Information to Defendant, or purchased Defendant's services, had they known or been told that Defendant would not disclose their Private Information to unauthorized third parties.

320.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiff and the Class have suffered harm: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise and publication of their Private Information;(iii) lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, e.g., access to their private and personal data; and (iv) the loss of the right to control how their Private Information is used.

321.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

**COUNT V**
**VIOLATION OF THE ILLINOIS EAVESDROPPING/INTERCEPTION COMMON AND STATUTORY LAW**
**720 ILCS 5/14-2(a)(5)**
**(On behalf of Plaintiff and the Illinois Class)**

**CLASS ACTION COMPLAINT**

322. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

323. Defendant's use of Tracking Tools as alleged above constitutes an "eavesdropping device" pursuant to 720 Ill. Comp. Stat. Ann. 5/14-1(a) because the Tracking Tools are capable of intercepting or transcribing electronic communications via computers and the internet.

324. Plaintiff's and Class Members' submission of information on Defendant's Website constitutes "private electronic communications" pursuant to 720 Ill. Comp. Stat. Ann. 5/14-1(e) because they were, at a minimum, "signs, signals, writing . . . data, or intelligence" that was transmitted by a computer and Plaintiff and Class Members reasonably intended for the electronic communications to be private as alleged above based upon federal and Illinois law.

325. Defendant used or disclosed the information that it obtained from Plaintiff's and Class Members' private electronic communications on Defendant's Website, Patient Portal, and App as a result of Defendant's use of Tracking Tools as an eavesdropping device in the manner described above.

326. Defendant did not have the consent of Plaintiff and Class Members to use or disclose their private electronic communications from Defendant's Website.

327. Defendant knew or reasonably should have known that the information it was using and disclosing from Plaintiff and Class Members' private conversations or private electronic communications in violation of 720 ILCS 5/14-2(a).

328. As a direct and proximate result of Defendant's violation of 720 ILCS 5/14-2(a)(5), Plaintiff and Class Members sustained numerous injuries including but not limited to the, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their

**CLASS ACTION COMPLAINT**

Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

329.    Pursuant to 720 Ill. Comp. Stat. Ann. 5/14-6, Plaintiff and Class Members are entitled to equitable relief prohibiting Defendant from further use of the Tracking Tools to eavesdrop, as well as to actual and punitive damages.

**COUNT VI**
**NEGLIGENCE**
**(Alternative Count)**
**(On behalf of Plaintiff and the Class)**

330.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

331.    In the alternative, Plaintiff brings an action for negligence.

332.    Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

333.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

334.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

335.    While Defendant intentionally implemented the Tracking Tools, Defendant also knew or should have known that the Tracking Tools were capable of collecting personally identifiable information that constituted personal health information.

- 79 -
**CLASS ACTION COMPLAINT**

336. It was highly foreseeable that the world's most sophisticated digital marketing companies at issue here would be able to connect the website data related to past, present, and future medical care with specific individuals.

337. Defendant was negligent in one or more of the following ways: (1) failing to adequately train its marketing and digital departments on the privacy risks of using Tracking Tools; (2) failing to adequately review and test its marketing programs and web-based technology to ensure the Website was safe and secure for its patient to submit confidential Private Information; (3) intentionally implementing tracking technology that was known and specifically designed to collect and share users' browsing information with Third-Party marketing companies; (4) failing to timely remove or disengage the Tracking Tools when on notice about the unlawful disclosure and misuse of the Private Information; (5) failing to take steps to select HIPAA compliant marketing vendors and analytics tools; (6) failing to take steps to anonymize Plaintiff's and Class Members' web data before transmitting and sharing it with Third-Party Marketers; (7) failing to obtain proper consent for the disclosure of the Private Information; (8) failing to obtain proper consent for the use of the Private Information for marketing purposes; (9) failing to adequately warn Plaintiff and Class Members of the disclosure and use of the data for marketing purposes; (10) unjustly profiting from Plaintiff's and Class Members' Private Information; (11) otherwise failing to comply with HIPAA guidelines and statutory requirements; (12) otherwise failing to comply with FTC guidelines, warnings, and requirements; and (13) otherwise failing to design, monitor, and maintain its Website in a secure and confidential manner to protect Plaintiff's and Class Members Private Information from improper disclosure and use.

338. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members sustained numerous injuries including but not limited to the, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality,

**CLASS ACTION COMPLAINT**

conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

339. Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the negligence described herein including compensatory and consequential damages, and in the alternative nominal damages. Plaintiff further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiff, including, but not limited to:

    i. Removal of the Tracking Tools from sensitive parts of the Website, Patient Portal, and App;

    ii. Deletion of all analytics data collected through the Tracking Tools;

    iii. Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools;

**CLASS ACTION COMPLAINT**

iv. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

vii. Notice to its patients related to the disclosure and misuse of the Private Information.

viii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demand that this matter be tried before a jury.

DATE: April 27, 2026                    Respectfully Submitted,

*/s/ Joseph M. Lyon*
Joseph M. Lyon
Clint C. Watson
Kevin M. Cox
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*
*cwatson@thelyonfirm.com*
*kcox@thelyonfirm.com*

**CLASS ACTION COMPLAINT**

- 83 -

Gary Klinger
**MILBERG PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

***Counsel for Plaintiff and the Putative Class***

**CLASS ACTION COMPLAINT**